IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **INDUSTRIAL PROJECT SOLUTIONS, INC.**, | ] |
| | ] |
| **Plaintiff,** | ] |
| | ] |
| v. | ] CV-12-BE-3806-S |
| | ] |
| **FRAC TECH SERVICES, LTD,** | ] |
| | ] |
| **Defendant** | ] |

## MEMORANDUM OPINION

This contact dispute comes before the court on "Defendant's Motion to Transfer Venue" (doc. 5), after which this court entered an "Order to Show Cause" (doc. 7). The Plaintiff responded to the Order, opposing the transfer (doc. 9), and the Defendant replied (doc. 10); this matter has received thorough briefing. For the reasons stated in this Memorandum Opinion, the court finds that the motion to transfer venue is due to be GRANTED.

## FACTS

On August 15, 2011, Plaintiff Industrial Project Solutions, Inc (IPS), an Alabama corporation, and Defendant Frac Tech Services, Ltd., a limited liability company organized in Texas with its principal place of business in Texas, entered into written agreements to build a Trans-Load System at two of Defendant's facilities, one in Minot, North Dakota, and the other in Eighty-Four, Pennsylvania. Both of the written agreements were proposals from IPS, providing systems descriptions and proposed services and payment terms with a signature line for purchaser acceptance, and a signature on behalf of Frac Tech with the August 15, 2011 date. Neither of

1

these agreements purported to be a Master Agreement between the parties, but each concerned one facility. Above the purchaser acceptance signature, both documents contain the language "**Standard IPS Terms and conditions are part of this proposal.**"

According to the document labeled "Terms and Conditions" and attached to the affidavit of Fabian Ros, the President of IPS, the standard terms and conditions include the following:

> The Contract shall constitute the entire Contact between the parties for the sale, fabrication, and installation of the product or equipment to which it applies. Prior agreements, meeting notes, conversations or any other communications form no part of this Contact and are specifically excluded from this Contract. No modifications to these Terms and Conditions shall be effective unless made in writing and signed by an authorized representative of IPS and PURCHASER. Any additional or different terms and conditions contained in any purchase order issued by Purchaser shall be of no effect nor in any circumstances binding upon Seller unless specifically accepted by Seller in writing.
>
> **Choice of Law**
> This Contract and any disputes arising under or related to it shall be governed by the laws of the State of Alabama, and venue shall be proper in Jefferson County, Alabama.

(Doc. 9-1, at 9-20).

After executing these two contracts, the parties began negotiating a Master Services Agreement. On February 13, 2012, Ros sent an email to James Kelly, Frac Tech's General Counsel, that stated as follows:

> Thanks for working with Mr. John Cooper in resolving our Master Service Agreement. The agreement was acceptable as finally amended, tomorrow we will send you the signed agreement for your countersign.
>
> In regards to FTSI- IPS MSA effective date as you probably are aware we are currently executing a number of contracts for FTSI that are subject to our terms and conditions, therefore we feel that this new agreement should be effective for all new contracts (work orders) while

> the ongoing contracts should continue to be governed by the preciously executed contracts(work orders).
>
> Again thanks for your time and interest in having IPS an approved FTSI vendor.

(Doc. 9-1). According to Ros's affidavit, IPS never received a response to this email.

On February 20, 2012, IPS signed the negotiated Master Services Agreement and on February 28, 2012, Kelly signed it on behalf of Frac Tech. The Master Services Agreement contains an effective date of February 28, 2012 and provides in relevant part as follows:

> 1. <u>Preamble</u>
>
> This Agreement is a non-exclusive master service contract that shall control and govern the performance of services and the provision of labor, materials, supplies, equipment, machinery, goods or other products by Contractor to company from time to time under a Work Order .... It shall be used as the Agreement between Company and Contractor in conjunction with one or more Work Orders as may be used by Company to Contractor that may specify other terms or agreements pertaining to the specific Work covered by such Work Order. Any terms or conditions set forth in a Work Order shall not alter, modify or amend any term or condition of this Agreement, and no other documents that conflict with this Agreement shall take priority over this Agreement unless the parties comply with the requirements of Section 16 hereof....
> ***
> 3. <u>Work Orders:</u>
> ***
> > d. <u>Work Order Terms</u> - All Work Orders, whether written or verbal, shall include the terms set forth in Exhibit "A". Nothing in any Work Order shall amend, alter, modify or otherwise change the terms and conditions - contained in this Agreement.
> ***
> 16. <u>Modifications, Amendments and Waivers:</u>
>
> Nothing in this Agreement shall be construed as authorizing any employee of either Company or Contractor to orally modify, alter, amend or waiver in any manner this Agreement or the terms and conditions hereof. This Agreement may be amended, modified or otherwise altered, or its provisions waived, only by a written

> amendment, signed by an authorized representative of each party ....
> \*\*\*
> 29. <u>Governing Law, Exclusive Venue:</u>
>
> To the maximum extent permitted by law, the laws of The State of Texas (without regard to any conflicts of law rules that would direct or refer to the laws of a different jurisdiction) shall govern the validity, construction, and enforcement of this Agreement and the rights and obligations of the Parties hereunder.  Notwithstanding the provisions of Subsection 11.e. above, the Parties agree that venue for any litigation between the Parties shall be exclusively in a state district court of Tarrant County, Texas, or the United States District Court for the Northern District of Texas, Fort Worth Division (provided the amount in controversy exceeds the minimum jurisdictional limit required to file in federal court), and the Parties agree to submit to personal jurisdiction therein; provided, however, that the foregoing shall not be construed to limit the rights of a Party to enforce a judgment or order from either of these courts in another jurisdiction.
> \*\*\*
> 33. <u>Entire Agreement:</u>
>
> This Agreement, the Exhibits hereto, and any Work Order(s), to the extent any such Work Order(s) comply with Subsection 3.d. of this Agreement, constitute the sole and complete agreement of the Parties and supersedes all other agreements or representations of any kind or character, oral, written or otherwise, not included herein that relate to the Work and the purchase of Goods.  All prior master service agreements between the Parties are cancelled, and this Agreement shall govern any Work commenced and Goods purchased during the term of this Agreement.  The Parties acknowledge and agree that there have been no material representations made by either Party as an inducement for the other Party to enter into this Agreement other than what is expressly set forth and contained in this Agreement.

(Doc. 6-1, at 1, 3, 4, 14, 18-19).

On April 30, 2012, Frac Tech canceled the agreements for IPS to build Trans-Load Systems at Frac Tech's facilities in Minot, North Dakota and Eighty-Four, Pennsylvania.  Upon receiving the cancellation, IPS demanded amounts it claimed were due and owing, and Frac Tech refused to pay the amounts claimed.

On September 28, 2012, IPS filed the instant suit against Frac Tech in Circuit Court in Jefferson County, Alabama, alleging breach of the Minot agreement and of the Eighty-Four agreement, and also asserting its entitlement to recover based on quantum merit, account stated, and open account, as to those two agreement.  The Complaint attached, among other documents, the 2011 agreements but did not refer to or attach the 2012 Master Services Agreement.

On November 5, 2012, Frac Tech removed the case to this court, and on November 12, 2012, it filed an Answer and Counterclaim (doc. 3) against IPS, asserting breach of contract, referencing design and construction flaws in both the Minot and Eighty-Four projects, and fraud and suppression.  The Answer and Counterclaim did not mention the 2012 Master Services Agreement, but did state that venue was not proper.

Also on November 12, 2012, Frac Tech filed the instant motion for change of venue, relying on the Master Services Agreement and its forum selection clause.

## ANALYSIS

The venue issue in the instant case revolves around whether the Master Services Agreement ("MSA") and its forum selection clause applies to the contract dispute in the instant case involving specific Work Orders executed before the MSA.  That forum selection clause specifies that Texas is the exclusive venue for both state and federal lawsuits between the parties. IPS argues that the 2011 contracts apply, and that the Master Services Agreement does not.  Frac Tech, on the other hand, argues that the MSA applies and alters the Work Orders so that the exclusive venue for any law suit must be in Texas.  The court must determine who is correct as a matter of law.  If the MSA's forum selection clause does not apply, then no viable reason exists to justify disturbing IPS's choice of forum and to transfer the case.

As noted, IPS takes the position that the MSA does not apply. As a basis for that position, it points to the original Work Orders, which provide that IPS standard Terms and Conditions apply.  In turn, those Terms and Conditions provide that Alabama law applies and that venue is proper, although not exclusive, in Jefferson County, Alabama. No dispute exists that when work commenced on the Minot and Eighty-Four projects, the 2011 agreements governed them.  The dispute is whether the MSA superceded these agreements when it went into effect in February of 2012.

IPS claims that the MSA applies to contracts for work that was commenced on or after that Agreement's effective date, but that it does not apply to projects such as the ones involved in this lawsuit that commenced *before* the Agreement's effective date.  IPS relies upon an email between the parties that pre-dates the MSA as well as the second sentence of paragraph 33 of the MSA, which reads in part: "this Agreement shall govern any Work commenced and Goods purchased during the term of this Agreement."

Alabama law provides that, when interpreting a contract, the court first must look to the "four corners of the contract" itself, and,  if the contract is unambiguous, the court must determine the parties' intentions from the plain meaning of the contractual language.  *Vesta Fire Ins. Corp. v. Libert Nat. Life Ins. Co.,* 893 So. 2d 395, 404 (Ala. Civ. App. 2003).  A contract is ambiguous when it is "susceptible of more than one reasonable meaning." *Homes of Legend, Inc. v. McCollough,* 776 So. 2d 741, 745 (Ala. 2000).  If the court determines that the terms are unambiguous, the court must presume that the parties intended what the contract states, and will enforce the contract as written.  Even when ambiguity arguably exists, "when the rules of contract construction are sufficient to resolve the ambiguity, the trial court must rule on that

basis, without resorting to parol evidence. . . ." *Id.*  One rule of contract construction is that "[i]nconsistent parts in a contract are to be reconciled, if susceptible of reconciliation...." *Sullivan, Long & Hagerty v. Southern Elec. Generating Co.,* 667 So. 2d 722, 725 (Ala. 1995). Further, "if there exists inconsistency between two clauses of a contract which cannot be reconciled, the inconsistency must be resolved in favor of the prior clause, unless an intention to thereafter qualify is plainly expressed." *City of Fairhope v. Town of Daphne,* 208 So. 2d 917, 924 (Ala. 1968).  Where one construction gives effect to all contract provisions and the other does not, the court should apply the construction giving effect to all provisions.  *See Ex parte Homes of Legend, Inc.,* 831 So. 2d 13, 16 (Ala. 2002) (stating "[w]e adopt this construction because it is the only reasonable construction that gives effect to both provision and, thus, upholds, rather than destroys, the terms of the written warranty.").

Only when the rules of contract construction are insufficient to resolve any alleged contractual ambiguity may the court use parol evidence to do so. *Childersburg Bancorporation, Inc. v. People State Bank of Commerce,* 962 So. 2d 248,  (Ala. Civ. App. 2006).

Therefore, the court first turns to the contract, the MSA itself, and considers not only the second sentence of paragraph 33, upon which IPS relies, but also the contract as a whole.  The contract provides in paragraphs 1, 3, 16, and 33 that the MSA shall govern the relationship and services performed between the parties, that no work orders or other document inconsistent with the MSA can modify it, and that the MSA can only be modified through a written MSA amendment signed by both parties.  The first sentence of Paragraph 33 specifically states that the MSA together with any Work Orders, but only to the extent the Work Orders are consistent with

the MSA[1], "constitute the sole and complete agreement of the Parties and *supersedes all other agreements* or representations of any kind or character, oral, written or otherwise, not included herein that relate to the Work and the purchase of Goods." (Doc. 6-1, at 19) (emphasis added). That first sentence does not specify any exception to the superseding of prior agreements and specifically says that even separate Work Orders cannot modify the MSA.

IPS does not focus on the other language of the MSA but points only to the second sentence of paragraph 33, which reads: "All *prior master service agreements* between the Parties are cancelled, and this Agreement shall govern any Work commenced and Goods purchased during the term of this Agreement." (Doc. 6-1, at 19) (emphasis added). Under IPS's interpretation, sentence two in effect creates an exception to sentence one; in other words, IPS would have the court read the two sentences as saying that the MSA does not apply to work commenced and goods purchased prior to February 28, 2012, so the MSA would supersede all agreements – not just "prior MSAs" – *except those* involving work commenced and good purchased prior to the MSA effective date.

The court disagrees with this argument and this construction of the contract language. The court does not find the language of the MSA to be ambiguous. Because the contract is not ambiguous, the court does not consider the parol evidence[2] that IPS proffers. Rather, the court

---

[1] Paragraph 33 states "This Agreement, the Exhibits hereto, and any Work Order(s), to the extent any such Work Orders comply with Subsection 3.d of this Agreement, constitute the sole and complete agreement of the Parties and supersedes all other agreements. . . ."Subsection 3.d of the MSA states that "[n]othing in any Work Order shall amend, alter, modify or otherwise change the terms and conditions - contained in this Agreement." (Doc. 6-1, at 4 & 19).

[2] Specifically, the court notes that the parol evidence – the email that was sent prior to the effective date of the MSA – is inconsistent with the terms of the MSA because it calls for the prior Work Orders to modify the terms of the MSA.

determines that the ordinary and plain meaning of its language is that the MSA -- and Work Orders *to the extent that they do not attempt to amend or modify the MSA* – together govern the relationship of the parties and the services provided between them, superceding all other agreements, including the prior Work Orders at issue *to the extent that they attempt to modify the MSA*. No dispute exists that the prior Work Orders at issue referred to and incorporated IPS Terms and Conditions, which specified that Jefferson County, Alabama was an appropriate venue for litigation between the parties and that Alabama choice of law governed. However, the MSA, which supercedes them, provides that Texas is the exclusive venue for litigation and that Texas choice of law applies. Thus, the Work Orders at issue have provisions that clearly conflict with the MSA and, if put into effect, would amend, alter, modify or change the MSA, and thus, would violate MSA Paragraphs 3.d. and 33. Therefore, having determined that the MSA supercedes all other agreements and Work Orders such as the ones at issue that conflict with its terms, the court finds that the MSA controls the relationship between the parties and that the MSA provisions concerning venue and choice of law also control.

  Alternatively, assuming *arguendo* that the language of the MSA is ambiguous – and the court has already found that it is not – the court's application of the rules of contract construction also results in the court's finding that the MSA applies and its provisions concerning venue and choice of law control. Although IPS focuses on sentence two of Paragraph 33 to support its argument that the MSA does not apply to work commenced before the MSA effective date, the rules of contract construction require that the court analyze the contract as a whole and construe it to give consistency and effect to all its provisions, if possible. The contract provisions in Paragraph 3.d. and sentence *one* of paragraph 33 – that the MSA, along with Work Orders to

the extent they do not conflict with the MSA, together constitute the "sole and complete agreement of the Parties" – clearly recognize that such prior Work Orders exist and are still in effect *but only as long as they are consistent with the MSA*. So, based on the sentence one language, no provision of any Work Order remains in effect to the extent it attempts to modify the MSA. In light of that language, the court cannot accept IPS's proffered interpretation of sentence two as providing that the MSA only applies to agreements and Work Orders for work commenced on or after the MSA effective date but does not apply to agreements and Work Orders for work commenced prior to that date. Such an interpretation directly conflicts with sentence one, and ignores the sentence two only cancels *prior* MSAs. The only reasonable way for *both* sentences to take effect is for the first sentence to address all prior agreements of any kind between the parties (the MSA superceded all prior agreements and superceded all Work Orders to the extent they conflict with the MSA); for the first part of sentence two to address specifically prior master service agreements (the new MSA cancelled them, although none existed); and for the second part of sentence two to address agreements for work commenced and goods produced on or after the MSA effective date (the MSA governs them). That interpretation is also consistent with Paragraph 3.d., specifying that "Nothing in any Work Order shall amend, alter, modify or otherwise change the terms and conditions - contained in this Agreement." (Doc. 6-1, at 4).

      Therefore, following the rules of construction, the court must construe paragraph 33 and the contract as a whole as stating that the entire agreement between the parties is the MSA and prior work orders, including the Work Orders at issue, but only to the extent those work orders are consistent with the MSA. Because the provisions of the Work Orders at issue regarding

venue and choice of law contradict the MSA, the MSA supercedes them, and IPS cannot rely on them.

Having determined that the MSA applies to the contracts/Work Orders at issue, the court specifically finds that paragraph 29 of the MSA controls venue and choice of law; in that paragraph, "the Parties agree that venue for any litigation between the Parties shall be exclusively in a state district court of Tarrant County, Texas, or the United States District Court for the Northern District of Texas, Fort Worth Division. . . ."  Thus, the parties have contracted for jurisdiction to be exclusively in Texas.  Further, they have contracted that "the laws of The State of Texas (without regard to any conflicts of law rules that would direct or refer to the laws of a different jurisdiction) shall govern the validity, construction, and enforcement of this Agreement and the rights and obligations of the Parties hereunder."  (Doc.  601, at 18 ).

Given that contract selecting Texas as the forum and Texas law as the choice of law, Frac Tech asks this court to transfer the case pursuant to 28 U.S.C. § 1404(a) to the United States District Court for the Northern District of Texas.  Section 1404(a) provides as follows: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented."  28 U.S.C. § 1404(a).

The Eleventh Circuit has previously addressed forum selection clauses in the context of requests to transfer pursuant to Section 1404(a) and motions to dismiss for improper venue and has determined that courts should enforce such clauses absent some exceptional situation.  *See Rucker v. Oasis Legal Fin., LLC,* 632 F.3d 1231, 1236 (11th Cir. 2011); *In re Ricoh Corp.,* 870 F.2d 570, 573-74 (11th Cir. 1989).  In the decision of *In re Ricoh Corporation,* the Eleventh

11

Circuit addressed the defendant's request for a writ of mandamus compelling the transfer of the case pursuant to a forum selection clause.  870 F.2d at 573-74.  Noting that federal courts traditionally accord deference to the plaintiff's choice of forum, the Court of Appeals refused to accord such deference when a valid forum selection clause applies; the court explained:

> [i]n attempting to enforce the contractual venue, the movant is no longer attempting to limit the plaintiff's right to choose its forum; rather, the movant is trying to enforce the forum that the plaintiff had already chosen: the contractual venue.  In such cases, we see no reason why a court should accord deference to the forum in which the plaintiff filed the action.  Such deference to the filing forum would only encourage parties to violate their contractual obligations, the integrity of which are vital to our judicial system.

*Id.* at 572.  Consistent with that discussion, the Court determined that the party who opposes the enforcement of a valid forum selection clause bears the burden of persuading the court that the contractual forum is "sufficiently inconvenient to justify retention of the dispute" or that the "interest of justice" would otherwise require retention .*Id.*

In determining whether the plaintiff had met that burden, the Eleventh Circuit noted the statement of the United States Supreme Court in the decision of *Stewart Org., Inc. v. Ricoh Corporation* that a forum selection clause is "a significant factor that figures centrally in the District Court's calculus."  *Id.*  (quoting *Stewart Org., Inc..,* 487 U.S. at 29).  The Supreme Court had acknowledged in that decision that no single concern should govern the transfer issue and that other factors might "conceivabl[y]" militate against transfer.  *Id.* (citing *Stewart Org., Inc.*, 487 U.S. at 30-31).    The Court of Appeals proceeded to explain, however, that  "the clear import of the Court's [*Stewart*] opinion is that the venue mandated by a choice of forum clause rarely will be outweighed by other 1404(a) factors."  *In re Ricoh Corp.,* 870 F.2d at 573 (citing *Stewart Org., Inc.,* 487 U.S. at 29-30 & 40-41).  Concluding that the "exceptional" situation did

not exist in the case before it, the Eleventh Circuit found that the district court had clearly abused its discretion in not giving effect to the forum selection clause, and therefore, the Court granted the application for writ of mandamus. *Id.* at 574.

In the recent *Rucker* decision, the Court of Appeals addressed an appeal of the denial of a motion to dismiss for improper venue based on a forum selection clause, stating that "forum selection clauses are presumptively valid and enforceable unless the plaintiff makes a strong showing that enforcement would be unfair or unreasonable under the circumstances." 632 F.3d at 1236. The Court conducted an analysis of the following factors set forth in *M/S Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1 (1972) to determine whether the plaintiffs had met that burden by establishing that "(1) [the forum selection clause's] formation was induced by fraud or overreaching; (2) the plaintiff was deprived of its day in court because of inconvenience or unfairness; (3) the chosen law would deprive the plaintiff of remedy; or (4) enforcement of the clause would contravene public policy." *Rucker,* 632 F.3d at 1236 (quoting *Krenkel v. Kerzner Int'l Hotels Ltd.,* 579 F.3d 1279, 1281 (11th Cir. 2009)). Finding that the plaintiffs had not met the necessary "strong showing," the Court reversed and remanded, with instructions to give effect to the forum selection clause and to dismiss the action based on improper venue. *Id.* at 1237.

Similarly, the instant case does not present the rare or "exceptional" situation where other 1404(a) factors outweigh the significant factor of the forum selection clause. Nor has the plaintiff made a strong showing that the *Bremen* factors militate against transfer. In addition to the forum selection clause, the facts presented to the court indicate that the parties are two businesses and that the contract between them was freely negotiated with no evidence of fraud, duress, misrepresentation, or misconduct. Further, IPS has not shown that transferring the case

would deprive it of its day in court, deprive it of a remedy, contravene public policy, or result in piecemeal litigation. The court, in its discretion, FINDS that balancing the convenience of the parties and the interest of justice results in giving effect to the forum selection clause and transferring this case, pursuant to 28 U.S.C. § 1404(a), to the United States District Court for the Northern District of Texas, Fort Worth Division.

      Simultaneously with this opinion, the court will enter a separate, consistent Order.

      Dated this 31st day of January, 2013.

                                                KARON OWEN BOWDRE
                                                UNITED STATES DISTRICT JUDGE